IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| PAMELA GOFORTH and | : | Case No. 10-11155-TPA |
| STEVEN GOFORTH, | : | |
| *Debtors* | : | Chapter 7 |
| | | |
| PAMELA GOFORTH and | : | Adv. No. 10-1151-TPA |
| STEVEN GOFORTH, | : | |
| *Plaintiffs* | : | Related to Doc. Nos. 30, 38 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |
| DEPARTMENT OF EDUCATION, | : | |
| *Defendant* | : | |

*Appearances:*     Lloyd Wilson, Esq., for the Debtors/Plaintiffs
Megan E. Farrell, Esq., for the Defendant

**<u>MEMORANDUM OPINION</u>**

Debtors filed this adversary proceeding in an effort to obtain a discharge of their student loan obligations because of undue hardship, pursuant to *11 U.S.C. §523(a)(8).* After the close of pleadings and discovery, an ***Amended Motion for Summary Judgment*** ("Motion"), Doc. No. 30, was filed by the Defendant, United States of America, Department of Education. The Debtors responded to the *Motion,* and the Parties filed briefs. The Court heard oral argument on the *Motion* on February 6, 2012 and at that time granted the *Motion* in an oral ruling from the bench, followed by a brief written Order entered later that date. *See* Doc. No. 38. The Court indicated at the time that it was reserving the right to issue a written opinion setting forth its findings of fact and

1

conclusions of law in the event the Debtors were to appeal the decision. The Debtors have now filed a notice of appeal,[1] and in accordance with the prior reservation, the Court submits this *Memorandum Opinion* setting forth its findings and conclusions as to the previously-granted *Motion*.[2]

## PROCEDURAL AND FACTUAL HISTORY

Debtors Pamela and Steven Goforth (hereinafter referred to collectively as "Debtors" and individually as "Wife" and "Husband," respectively) filed this bankruptcy case on June 23, 2010, and received a discharge on September 27, 2010. Debtors then moved to reopen the case on November 12, 2010. That motion was granted on November 12, 2010, and the Debtors filed the present adversary action shortly thereafter. According to the rather skeletal complaint, the Debtors are both in their mid-50s. Wife owes $51,656 in student loan debt and Husband owes $45,439.[3] These loans were incurred for college courses toward degrees in Psychology and Fine Arts for Wife and in Computer Information Sciences for Husband, though neither completed the necessary course work for the degrees and neither is currently employed in fields relevant to the credits. Debtors contend it would be an undue hardship if they are required to repay the loans.

---

[1]    The Debtors were represented by Counsel before this Court, but are pursuing the appeal on a *pro se* basis.

[2]    The Court has jurisdiction over this matter pursuant to *28 U.S.C. §1334*. The matter is a core matter pursuant to *28 U.S.C. § 157(b)(2)(A),(I)* and *(O)*. This *Memorandum Opinion* constitutes the Court's findings of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052*.

[3]    In its Answer to the Complaint, the Defendant asserts that Wife's loan balance is $52,312.96 and Husband's is $46,588.30. In the *Motion*, Defendant asserts the balances are $54,310 for Wife and $47,823 for Husband. Presumably the differences are due to accruing interest. In any event, the Parties are in rough agreement as to the size of the loan balances, and the precise amount of the balances is not crucial to the Court's determination.

The relative paucity of information concerning the circumstances of these Debtors and their student loans available in the pleadings was substantially fleshed out in the *Motion* and the accompanying evidentiary materials submitted by the Defendant.   The *Motion* sets forth 53 paragraphs of what it contends are undisputed material facts, with citations to the record in support. The "record" as presented by the Defendant in this instance consists of transcripts of depositions of the Debtors that were taken on October 20, 2011, "National Student Loan Data System ("NSLDS") printouts for the loans of each of the Debtors,[4] and an affidavit from Rubio Canlas, a loan analyst employed by the Defendant, which includes as attachments loan history information for the Debtors' loans.

By their *Response* to the *Motion*, the Debtors demonstrated that the Parties are in overwhelming agreement as to the material facts of the case.   The Debtors only outright deny four of the 53 factual paragraphs in the *Motion*, some of which relate to minor points anyway.[5] Consistent with that, in the brief the Debtors filed in opposition to the *Motion*,  they state that they "do not disagree with the facts as enumerated" in the *Motion* and supporting brief.   The factual narrative that follows is therefore undisputed by the Debtors, except as may be specifically noted.

Wife was born in 1955.   She did not finish high school but earned a GED in 1983.   Her work history includes time working as a certified nurse's aide, a home health assistant, in cleaning, and in factory assembly positions.   When she was about 45 years old she made the decision to attend

---

[4]   The NSLDS printouts are not authenticated by affidavit or otherwise, and thus had the Debtors made an objection the Court may not have considered them as competent evidence in connection with the *Motion*.  However, since the Debtors did not make such objection, and in fact have admitted to the truthfulness of the portions of the printouts relied upon by the Defendant for its *Motion*, the Court may properly consider them.  *See*, *e.g.*, *In re Madera,* 363 B.R. 718, 720 n.2 (Bankr. E.D. Pa. 2007).

[5]   The *Response* uses the unusual terminology of "not denied" rather than "admitted", but at oral argument on the *Motion* Counsel for the Debtors agreed it had the effect of an admission.

Clarion University in the hope that she would thereby be able to obtain a better job. She majored in

Fine Arts and minored in Psychology, with a career goal to work as an art therapist with nursing

home patients. Wife attended Clarion for a number of years and completed 104 credits, but she has

not obtained a degree.

In order to finance her education at Clarion, Wife took out a series of individual

Stafford loans under the Federal Family Education Loan Program ("FFEL") during the period from

June 21,2002 through July 25, 2005. The loans were made by private lenders and guaranteed by the

Pennsylvania Higher Education Assistance Agency ("PHEA"). Eight of these loans, totaling

$21,563, were subsidized, and another eight totaling $21,124, were unsubsidized. Wife consolidated

these various loans on August 17, 2006, into a single FFEL Consolidation Loan in the amount of

$44,995. On July 19, 2010, the loan was further "consolidated" into two loans under the William D.

Ford Direct Loan Program, a subsidized loan of $22,078 and an unsubsidized loan for $28,770.[6]

Husband was also born in 1955. He did not finish high school but earned a GED in

1994. His work history includes time working for various employers as a general unskilled laborer,

for example in lumberyards, and a few acting positions. Around 2002 Husband made the decision

to attend Clarion University, majoring in Computer Information Systems. He attended Clarion for

a number of years and completed 78 credits but he has not obtained a degree. Subsequently, Husband

attended a four-month trade school, with the tuition paid by the Commonwealth of Pennsylvania, and

---

[6]    The Direct Consolidation Loan for Wife is thus a *postpetition* obligation, not even subject to discharge
under *11 U.S.C. §727(b)*, and the *Motion* could be granted as to her loan on that basis alone without even needing to
engage in an undue hardship analysis. *See*, *In re Miller*, 2006 WL 2361819 (Bankr. W.D. Pa. 2006). For the sake of
completeness, the Court will nevertheless analyze Wife's circumstances under the applicable undue hardship
standard as discussed *infra*.

in October 2010 he obtained a certification from this school in computer and network systems support, maintenance, and repair.

In order to pay for his education at Clarion, Husband similarly took out a series of individual Stafford loans under the FFEL Program, his loans coming during the period from March 28, 2002 through July 15, 2005.   Eight of these loans, totaling $16,875, were subsidized, and another eight, totaling $20,187, were unsubsidized.   Husband consolidated these various loans on June 8, 2006, into a single FFEL Consolidation Loan in the amount of $40,451.  On March 5, 2010, the loan was further "consolidated" into two loans under the William D. Ford Direct Loan Program, a subsidized loan of $22,300 and an unsubsidized loan for $23,138.

On January 17, 2011, both of the Debtors enrolled into the "Income Contingent Repayment Plan," or "ICRP," to repay their Direct Consolidation Loans.  Upon entering the ICRP they had the option to repay their loans jointly, in which case both of their loan balances would be combined to determine a monthly repayment amount.  Debtors, however, elected to have their loans treated individually.   Under that election, the monthly repayment for Wife is $227.52 and for Husband it is $203.20.  By contrast, if the Debtors agreed to joint treatment under ICRP, their combined monthly repayment, as calculated by Canlas based on a combined loan balance of $102,133 and an adjusted gross income of $25,635, would be $182.08, a reduction of almost $250 per month.

The Debtors are also eligible for but have chosen not to participate in a program called the "Income-based Repayment Plan," or "IBR."  Canlas ran the calculations and determined that if the Debtors participated in the IBR,  Husband's monthly repayment would be $21 and Wife's would be $24.  These figures can apparently vary from year to year depending on fluctuations in income.

If a borrower repays under IBR for 25 years and meets certain other requirements, the remaining balance of the debt is cancelled.

In Schedule I of their bankruptcy petition the Debtors showed a current monthly income of $1,231. However, at the depositions held in October 2011 they testified that their monthly income was between $2,104 and $2,184 and additionally supplemented by odd jobs. Wife had a weekly income of $273 in unemployment compensation and between $60 and $100 from part-time home health aide job she has had since 2005 which pays her $9.09 per hour . She also does odd jobs such as dog sitting and an eBay based internet business of restoring old photos, though the earnings from these are modest. At the time of his deposition, Husband's weekly income consisted of $173 in unemployment and $20 from odd jobs. In his most recent regular prior job, from December 2010 to August 2011, Husband was earning $8.75 per hour in a temporary laborer position. Based on his trade school certification, Husband is also eligible to take examinations to obtain an "A-Plus Certification" or a "Network Plus Certification." If and when he takes and passes one or both of those exams he will be qualified to obtain work as a computer network person, with estimated earnings from $8 to $15 per hour.

In Schedule J of their petition, the Debtors indicated average monthly expense of $1,817. Again, however, this amount was modified and explained somewhat at the depositions held in October 2011. For instance, although they show $175 per month as rent or home mortgage payment expense, they do not actually pay that for the rent of their residence, which is owned free and clear by an adult daughter (born in 1974) who allows them to live there. The daughter is incarcerated in Oklahoma and the Debtors pay the $175 to cover the rent for a trailer she owns in

6

Oklahoma which is currently sitting vacant.  The Debtors also give this daughter about $40 per week for things she needs.  A $300 per month Rent-a-Center payment listed on Schedule J has now been paid off.  Finally, the Debtors donate significant amounts to CBN (Christian Broadcasting Network), totaling approximately $2,500 for the year 2011 (or about $250 per month) as of the time of the depositions.

With the above factual background in mind, the Court will turn to a legal discussion of the issues raised by the *Motion*.  Any additional factual material for consideration will be introduced as necessary.

### SUMMARY JUDGMENT STANDARD

For purposes of resolving a summary judgment motion, *Fed.R.Civ.P. 56* is made applicable to adversary proceedings through *Fed.R.Bankr.P. 7056.* Summary judgment is appropriate if the pleadings, depositions, supporting affidavits, answers to interrogatories and admissions that are part of the record demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Bankr.P. 56(c), Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Summary judgment is appropriate if no material factual issue exists and the only issue before the Court is a legal issue. *Earth Data Int'l of N.C., L.L.C. v. STV, Inc.*, 159 F. Supp.2d 844 (E.D. Pa. 2001); *In re Air Nail Co., Inc.*, 329 B.R. 512 (Bankr. W.D. Pa. 2005). The test under *Fed.R.Civ.P.* 56 is "whether the moving party is entitled to judgment as a matter of law." *Med. Protective Co. v. Watkins,* 198 F.3d 100, 103 (3d Cir. 1999) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

Once the moving party satisfies its burden of establishing a *prima facie* case for summary judgment, the non-moving party must respond with contrary evidence and do more than raise some metaphysical doubt as to material facts, otherwise judgment will be entered in favor of the movant. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir.1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). No issue for trial exists, in fact, unless the non-moving party can adduce sufficient evidence favoring it on the disputed factual issue such that a reasonable jury could only return a verdict in its favor. *Celotex,* 477 U.S. at 322. "It is important to note that, even if a genuine factual dispute is shown to exist, such showing may not necessarily suffice to preclude the entry of a summary judgment. Indeed, the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *In re Allegheny Health, Educ. & Research Found.*, 321 B.R. 776, 789 (Bankr.W.D.Pa.2005). Also, where the movant is either the defendant or the party without the burden on the underlying claim, as is the case here, the movant has no obligation to produce evidence negating its opponent's case. *Air Nail Co.,* 329 B.R. at 528; *Nat'l State Bank v. Fed. Reserve Bank*, 979 F.2d 1579, 1581–82 (3d Cir.1992).

### *LEGAL DISCUSSION*

Under *11 U.S.C. §523(a)(8),* student loans are excepted from discharge unless to do so would impose an "undue hardship" on the debtor and the debtor's dependents. The "undue hardship" term is not defined in the Bankruptcy Code but the most widely-recognized standard is the one set forth in *Brunner v. N.Y. Higher Educ. Servs. Corp*., 831 F.2d 395 (2d Cir. 1987). Under this test undue hardship requires proof that: (1) based on current income and expenses the debtors cannot

8

maintain a minimal standard of living for themselves, and any dependents, if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the loans; and, (3) the debtors have made good faith efforts to repay the loans.  This 3-part test was adopted by the Third Circuit in *In re Faish*, 72 F.3d 298 (3d Cir. 1995).

The Debtors have the burden of proof by a preponderance of the evidence as to all three prongs of this test.  *In re Fabrizio*, 369 B.R. 238, 244 (Bankr. W.D. Pa. 2007).  Each of the prongs must be satisfied, individually before a discharge of the obligation can be granted, and if any one prong is not satisfied, that may end the court's inquiry without a discharge being granted.  *In re Flickinger-Luther*, 462 B.R. 157, 161 (Bankr. W.D. Pa., January 4, 2012).  Finally, while considering each prong the Court may not consider any extraneous factors outside of the *Brunner* framework, including equitable concerns.  *Id*.  The Court will now consider each of the *Brunner* factors in turn with respect to these Debtors.

<u>*Can the Debtors Maintain a Minimal Standard of Living?*</u>

Under the first prong the Debtors must prove that they cannot maintain a minimal standard of living based on their current financial condition if forced to repay the loans. *Faish*, 72 F.3d at 306.  Debtors must go beyond showing that repayment of the loans will lead to tight finances. *Id*.  Debtors cannot satisfy this prong if they could make the loan payments by engaging in some "short-term belt tightening." *Id.*

9

The Defendant argues that the Debtors could meet their current combined monthly loan payment obligation of $430.92 by eliminating or reducing the approximately $250 per month they are contributing to CBN, the approximately $335 per month they are paying to or for their adult daughter, and the $57 per month they are paying for internet and cell phone. The Defendant also states that the Debtors have the ability to reduce their monthly loan obligation by "taking advantage" of the other repayment options which are available to them. As explained above, the Defendant has submitted undisputed evidence to show that if the Debtors were to modify their current status under the ICRP from individual loan treatment to joint treatment, they could reduce their required monthly payment to $182.08. If they were to enroll into the IBR, they could reduce the total monthly payment even further, all the way down to less than $50 per month.

There was no evidence presented to show that the Debtors are currently living below a minimal standard. Their current income as detailed in their depositions exceeds their expenses as set forth in their petition. If there has been any significant increase in expenses since the petition was filed, it was incumbent upon the Debtors to apprise the Court of that fact in responding to the *Motion*, but they did not do so.[7] The Court can only conclude that the Debtors have a monthly surplus of income over expense, albeit fairly small, and that they are maintaining at least a minimal standard of living. Therefore, any "savings" they can make from their current expenditures or increase in their

---

[7] Debtors did argue that Husband has a chronic medical condition that requires the payment of $188.58 per month, but the only proof they have provided for that are copies of some billing invoices from 2009. It should be noted that neither these documents, nor the other evidentiary materials submitted by the Debtors in response to the *Motion* (copies of some tax returns and a copy of a writ of certiorari to the U.S. Supreme Court supposedly prepared by Wife in another matter) were supported by affidavit or otherwise authenticated. Since the Defendant did not ask that these documents be excluded, the Court has considered them, giving them the weight they deserve. *See* n. 4, *supra*. In this instance, the billing invoices are of little weight since they are from more than two years ago and cannot establish current expenses. The Defendant also points out that Schedule J to the petition shows only $10 per month in medical and dental expenses, and that at his deposition Husband testified that there are no current medical or dental expense obligations outstanding.

income could be devoted to payments on the student loans without affecting their ability to maintain a minimal living standard.

In that regard, the Court finds that the Defendant has identified a number of expenses which can be reduced or eliminated entirely, as well as some opportunities for an increase in income. These are proper considerations with respect to the first *Brunner* factor. Income and expenses should not be regarded as unalterable. The proper inquiry is whether it would be unconscionable to require the Debtors to take any available steps to earn more income or to reduce their expenses. *Faish*, 72 F.3d at 307 (citing *Matthews v. Pineo*, 19 F.3d 121 (3d Cir. 1994), cert. denied 513 U.S. 820). The Court does not believe it would be unconscionable to expect that the Debtors could realize savings in their expenses by cutting back or eliminating the items identified by the Defendant.

Considering first the voluntary payments which the Debtors are making to CBN each month, the Court assumes they are properly characterized as charitable religious contributions. Although neither Party raised it, the *Religious Liberty and Charitable Donations Protection Act of 1998,* Pub. L. 105-183 (June 19, 1998) amended some provisions in the Bankruptcy Code to place restrictions on what could be required of debtors in bankruptcy with respect to their charitable contributions. *Section 523(a)(8),* however, was not affected by this Act, so by a plain language reading, the Act would not apply in this case. Some courts in similar cases have nevertheless been asked to "import" the principles of the Act by implication into the undue hardship analysis under *Section 523(a)(8)* and have split fairly evenly in their decisions. *See 36 A.L.R. Fed, 2d 1 (2009)* at §§19, 20. None of the cited cases is from the Third Circuit. Since the Debtors have waived any argument that the Act should be applied here, and in the absence of any contrary binding authority,

11

the Court will not "read in" the Act to its analysis, making the CBN contributions fair game for possible belt-tightening.

Up next for consideration as to possible savings are the payments the Debtors are making to or for their adult daughter.  Debtors argue that they have a legal duty to support their daughter because she is an indigent family member, citing in support *Savoy v. Savoy*, 433 Pa. Super. 549, 641 A.2d 596 (1994).  However, as correctly pointed out by the Defendant, no evidence has been presented to show that the daughter is indigent and in any event the decision in *Savoy* was based on a statute, *62 P.S. §1973(a)*, that was repealed effective July 7, 2005.  The current Pennsylvania statute dealing with the duty to support an indigent family member specifically provides that there is no such duty if "an individual does not have sufficient financial ability to support the indigent person."  *See 23 Pa. C.S.A.§4603(a)(2)(i)*.

There are additional problems with the Debtors' argument concerning payments to the daughter.  There was no evidence presented to show that the daughter petitioned for or requested payments from the Debtors.  She is a resident of Oklahoma, so there are issues as to the extraterritorial effect of the Pennsylvania statute.  Finally, she is currently incarcerated and thus presumably has her basic needs taken care of by the Oklahoma prison system.  For all these reasons, the Court concludes that the payments being made by the Debtors are voluntary and not due to a legal obligation.

A final item of potential savings pointed out by the Defendant is internet and cell phone expense.  Although the expense incurred by the Debtors for these is fairly minor, Debtors have not shown that these services  are necessary for work or otherwise, therefore they  could be cut.  *See,*

*e.g.*, *In re Berryhill*, 2011 WL 3861598 (Bankr. C.D. Cal. 2011).  The Defendant has thus identified potential monthly expense savings totaling over $600 per month which could be devoted toward payment on the loans.

Also on the expense side, the Court cannot ignore that the Debtors have it within their power to substantially reduce the monthly loan expense to as low as $50 or less by some of the administrative options described in the Canlas affidavit.  If there were some reasonable explanation as to why the Debtors have not done so, the Court would be willing to listen.  The Debtors have provided no such explanation, so the Court can only conclude they do not have one.

There also appear to be opportunities available to the Debtors to increase the income side of the ledger.  Husband has completed a computer certification course that by his own admission will result in him being qualified for computer network IT positions paying from $8-15 per hour once he passes the necessary exams.  He has failed them to this point, but he is able to retake them until he passes.  Wife has had a nurse's assistant certification in the past in North Carolina and there is nothing to prevent her from pursuing that designation in Pennsylvania which would expand her employment opportunities.

The Debtors had no direct  response to the proposition that they can make payments on the loans without falling below a minimal standard of living, by cutting expense or increasing income if necessary.  The Debtors do argue that the magnitude of their student loan debt to their annual income (approx. 5-to-1) is so high that the Court  should disregard other student loan cases that have found a lack of undue hardship where part of the reasoning was that unnecessary expenses could be cut out of the debtor's budget to allow for repayment of the loan.  In the Court's view the

ratio of loan debt to income, *per se*, is an irrelevant consideration under the *Brunner* test and represents an attempt by Debtors to inject the sort of extraneous factor or equitable concern into the case that *Faish* made clear must be excluded.  The real question is whether a debtor can afford the required monthly payments without falling below a minimal standard of living, and these Debtors can.

The Court concludes that the Defendant has established a *prima facie* case for summary judgment as to the first prong of the *Brunner* test and the Debtors have responded with little or no evidence to the contrary.  When the applicable summary judgment standard is applied, the Court finds that the Defendant is entitled to judgment as a matter of law as to this prong.  Given the Debtors' obligation to meet all three prongs in order to secure a discharge of the debt, the Court could simply stop here and have a sufficient basis to support its grant of the *Motion*.  However, for the sake of completeness the Court will proceed to review the remaining two prongs of the test.

### *Is the Debtors' Financial Condition Likely to Persist?*

Under this prong of the *Brunner* test, sometimes called the "additional circumstances" prong, the Debtors must show that their current state of affairs will not improve for a significant portion of the student loan repayment period.  This is a demanding requirement under which the Debtors must prove a total incapacity to repay the loans in the future for reasons beyond their control. *Flickinger-Luther*, 452 B.R. at 162.  Under this prong, a finding of undue hardship is reserved for the exceptional case and requires the presence of unique or extraordinary circumstances which would render it unlikely the Debtors would ever be able to honor their obligations.  *Id*.  The presence of

additional circumstances assists the Court in the difficult task of predicting future income.  *In re Nys*,

446 F.3d 938, 945 (9th Cir. 2006).

The Defendant argues that the Debtors have not shown anything to prove that additional circumstances exist indicating that they cannot maintain a minimal standard of living in the future if they are required to repay their loans.  The Debtors respond by arguing that they each have a medical impairment that restricts their earning ability.  Wife is alleged to have a cognitive disorder which renders her unable to coherently communicate in writing.  However, in responding to the *Motion*, as well as in their Pretrial Statement, the Debtors did not submit any expert medical report to confirm that such diagnosis in fact exists, and that if it does it prevents or significantly impairs her ability to be gainfully employed.[8]  The court in *In re Brightful*, 267 F.3d 324, 330 (3d Cir. 2001) made clear that just this sort of alleged mental problem cannot be used as a basis for finding additional circumstances to support the second *Brunner* prong unless there is a record basis to explain, at a minimum, how the Debtor was able to work in the past with the condition yet supposedly cannot do so in the future.

Furthermore, at the argument on the *Motion*, counsel for the Defendant indicated that in early January 2012 (after discovery had closed and after pre-trial statements, which were to have had any expert reports attached, were filed) she received a copy of a neuropsychological report from a Dr. Tofalo which concluded that Wife has no reading or math disorders and is capable of a wide variety of employment, including home healthcare, outdoor jobs, skilled technology, computer

---

[8]    The only evidence presented by the Debtors to support the existence of the Wife's alleged cognitive disorder is an excerpt from a *pro se* petition for writ of certiorari that she filed with the United States Supreme Court. This document was filed in 2003, indicating a contention that Wife has had the disorder since at least then, during which time she has been employed.

electronics, skilled  business, and social and health-related services.  Counsel for the Debtors conceded that the report was not favorable to the Debtors because it shows that while Wife does have some cognitive deficits, she is able to work.  The report was admitted into the record without objection.

Husband is alleged to have a hemorrhoid condition that impairs his earning capacity. Again, however, no medical evidence has been provided to substantiate the severity of the condition or how it may affect his earning capacity.  Husband has never been hospitalized for the condition and treats it with over-the- counter ointments and creams.  In August 2011 he had a colonoscopy done and the physician who performed it also gave him a prescription to help treat the condition.  When asked at his deposition if the hemorrhoids were a temporary condition, Husband said he did not know, and added that he has been fortunate so far that they haven't "severely injured" him.  The Pretrial Statement filed by the debtors on October 26, 2011, refers to the hemorrhoids as a temporary condition. *See* Doc. No. 15. The evidence presented by the Debtors as to Husband's condition falls well below their burden of proof to show that this is a long-lasting condition that will negatively affect his earning capacity.

There is also an issue as to the ages of the Debtors.  The contention is that if the loan debt is not discharged they will in all likelihood be paying on the loans until they are deceased, or very elderly, without ever paying the loans off.  Perhaps so, but that is a consequence of their voluntary choice to incur the loans at relatively advanced ages. In other cases where the age of the debtor has been put forward as an additional circumstance to support the second prong under *Brunner*, at least where the age is standing alone unaccompanied by serious illness or disability, the

16

courts have rejected the argument.  *See, e.g., Fabrizio, supra* (debtor 51 years old); *Educ. Credit Mgmt. Corp., v. Spence*, 341 B.R. 825 (E.D. Va. 2006) (debtor in mid-sixties with loan debt of $160,000); *In re Chapelle*, 328 B.R. 565 (Bankr. C.D. Cal. 2005) (debtor age 52);  *In re Jones*, 392 B.R. 116 (Bankr. E.D. Pa. 2008) (debtor 52 years old).  *See also, Jones v. Bank One Tex.*, 376 B.R. 138, 139 (W.D. Tex. 2007) (debtor cannot use age as  grounds to avoid repaying student loans as she chose to go to school later in life, which resulted in the debt persisting into her later age).

The Debtors have thus failed to adduce evidence to show a "total incapacity" in the future to pay their debts for reasons not within their control, *Brightful, 267 F.3d at 329*, and thus have failed to rebut the evidence presented by the Defendant.  Summary judgment is therefore appropriate with respect to the second prong of the *Brunner* test as well.

### *Have the Debtors made a Good Faith Effort to Repay the Loans?*

Under the final prong of the *Brunner* test,  the Debtors must prove that they have made a "good faith" effort to repay the loan over the entire time period from the date on which the first loan payment became due to the date on which the Debtors filed for bankruptcy.  *Fabrizio*, 369 B.R. at 244.  This prong of the test serves the function of ensuring that a debtor's financial plight is caused by factors beyond his reasonable control, rather than negligently or wilfully caused by him, as well as to guard against bankruptcies by former students motivated primarily by a desire to avoid payment of student loan debts.  *Id*.

Looking first at the issue of repayment efforts, an initial question is what  time period the Court should focus upon.  The Defendant argues that  the  relevant time period for this inquiry

17

is from the point of the Direct Consolidation Loans forward.  The Defendant contends that neither spouse has made any loan payments since the Direct Consolidations Loans occurred, citing the affidavit of the loan analyst Canlas to support that contention.  Defendant further notes that Wife's Direct Consolidation Loan did not even occur until a month after the bankruptcy petition was filed, and that the ICR program was entered by the Debtors in January 2011.  The Debtors dispute the contention that they have not made any loan payments during this period.  However, the only supporting evidence they have provided are copies of some tax return documents showing they took deductions for paying interest on student loans.  The last of these returns is from 2010, and the returns provide nothing to show when payments were made within a given tax year.  Thus, even assuming the Debtors did make payments on the loans in 2010, it could well have been prior to the dates of the Direct Consolidation Loans (March 5, 2010 for Husband and July 19, 2010 for Wife).  The Court thus finds that the Debtors have failed to meet their burden of proof on this issue and finds that no loan payments have been made by them since the inception of the Direct Consolidation Loans.

The legal significance of that finding requires some additional exploration.  In *Fabrizio* the Court noted that under the *Higher Education Act*, and particularly *20 U.S.C. §1074(a)*, the statutory language makes clear that federal consolidation loans are new agreements which discharge the liabilities of the old loans and create their own obligations.  369 B.R. at 244-45 (citing *In re Clarke*, 266 B.R. 301 (Bankr. E.D. Pa. 2001)).  Based on that fact, the debtor in *Fabrizio* stipulated that the relevant time period for consideration of whether a good faith payment attempt occurred began on the loan consolidation date. In light of the Debtor's stipulation in *Fabrizio*, the Court was not required to make a legal ruling as to whether that is in fact the relevant time period,

18

although such would certainly seem to follow from the law which treats consolidation loans as new obligations. Assuming for the moment that the date of consolidation begins the relevant period, then Husband did not make any loan payments between then and the date of the petition. Since Wife's consolidation did not occur until after the petition was filed, her situation does not fit neatly into the usual pattern. Clearly neither of the Debtors have paid on the loans since the petition was filed, including the period from September 27, 2010, when the case was closed until it was reopened on November 12, 2010, and further including the period since January 17, 2011 when they entered the ICRP.

Without deciding the legal issue, even if the relevant time period here is from the date of the Direct Consolidation Loans forward, the Court is reluctant to adopt the argument of the Defendant and treat the lack of payments since then as conclusive on the good faith issue given the brief windows of time between the consolidation date and the filing of the petition – only 3½ months for Husband, and no time with respect to Wife. The Court thus views the non-payment as somewhat in support of a lack of good faith, though not of overriding probative value, and certainly not dispositive of the issue.

Of considerably more significance on this issue in the Court's view is the unexplained failure of the Debtors to participate in the administrative programs previously described which would substantially reduce their monthly loan payments. A debtor's effort to seek out options that make the debt repayment obligation less onerous is an "important component" of the good faith inquiry. *Fabrizio*, 369 B.R. at 245. Although not conclusive, such efforts can support a finding that the debtor takes his loan obligation seriously and is doing his utmost to repay the loan despite his financial

19

circumstances.  *Id.*  Conversely, a failure of such efforts may be a "persuasive factor" to be weighed as part of the good faith analysis.  *Flickinger-Luther*, 462 B.R. at 164.

As noted previously, the Debtors here have offered no reasonable explanation as to why they have refused to apply for joint treatment of their loans under the ICR, or sought entry into the IBRP, either of which steps would dramatically lower their payment obligation.  Additionally, testimony given by the Wife during the depositions concerning this matter is quite troubling to the Court.  During her own deposition, even after being provided with an explanation about the various options that were available and how payments would be tied to income, Wife adamantly refused to consider them.  Subsequently, during Husband's deposition testimony, when he began expressing a willingness to "pay what we can" and then answered affirmatively to a question of whether he and Wife would be willing to each pay $50 per month on the loans, Wife interjected to contradict him and say they could not even afford that level of payment.

The Court does not find this indicative of a Debtor who is proceeding in good faith with respect to repayment of the student loans.  Demonstrative evidence of the almost belligerent or contemptuous attitude of Wife toward this debt was  provided at the argument on the *Motion*.  Wife was present in the spectators' seating portion of the courtroom and made a couple of unbidden outbursts responding to the arguments of Counsel and questions or comments from the Court directed to Counsel. The Court admonished her that this was improper conduct, but she persisted and the Court was finally required to call the United States Marshal and have her removed from the courtroom.  The Court views this type of conduct as a further demonstration of an obstinacy that is inconsistent with the good faith requirement.

Another point to be noted with respect to the good faith inquiry is the ratio of the Debtors' student loan obligation to their total unsecured debt, something this Court has previously recognized as a relevant factor for consideration. *Fabrizio*, 369 B.R. at 247. The relevancy here is that if student loan debt represents a significant portion of a debtor's debt, a court may conclude that discharge of the student loan debt was the prime motivating factor behind filing the bankruptcy case. A review of the Debtor's schedules in this case show that the student debt represents about 72% of unsecured debt. This is similar in magnitude to the 80% figure in *Fabrizio* that was found to be a "high ratio" of student loan debt that weighed against the debtor under the good faith prong. *See also, e.g., In re L.K.*, 351 B.R. 45, 55-56 (Bankr. E.D. N.Y. 2006) (ratio of "more than 70%" indicated lack of good faith). While the Court does not believe that in isolation the ratio of student debt to overall debt in the present case compels a finding of a lack of good faith, it is yet a further negative factor for the Debtors' position.

Finally, some courts have looked to the length of time between when the loan first became due and when the debtor sought discharge of the debt. *See, e.g., In re Fields*, 286 Fed. Appx. 246, 249 (6th Cir. 2007). The record is not entirely clear as to exactly when the loans in the present case first became due, though it would appear that it was in 2006 at the earliest, and possibly not until 2010 when the Direct Consolidation Loans were created. Either way the period between the initial due date and the filing of the adversary proceeding seeking to discharge the loans was relatively brief, providing yet a further factor militating against a finding of good faith by these Debtors. The Defendant thus has established entitlement to summary judgment with respect to the third prong of the *Brunner* test.

21

*CONCLUSION*

The Court is not unsympathetic to the situation of the Debtors, who may have had

unrealistic expectations when enrolling into Clarion and taking on the student loan obligations under

consideration to pay for it.   However, as the Defendant correctly points out, the Third Circuit has

held that the *Brunner* test must be "strictly construed; equitable concerns or other extraneous factors

not contemplated by the test may not be imported into the analysis of 'undue hardship'." *Brightful*,

267 F.3d at 327 (quoting *Faish*, 72 F.3d 298 (3d Cir. 1995)).

When the test is thus applied, it is clear that the *Motion* must be granted.  As to the

first *Brunner* factor, the Debtors have not shown that they would be unable to maintain a minimal

living standard if they are required to repay the loans.  To the contrary, the evidence shows that either

through a reduction in monthly expenses, an increase in monthly income,  a reduction in the monthly

loan obligation (via one of the repayment options), or any combination thereof, it should be possible

for the Debtors to make the loan payments while still maintaining a minimal standard of living.

Since the Debtors must show the existence of all 3 *Brunner* factors, the failure to do so

as to the first factor is itself a sufficient basis to grant the *Motion*.  Beyond that, the Debtors have

also failed to submit any convincing evidence as to the second *Brunner* factor concerning "additional

circumstances."  Neither  Husband nor Wife  has a condition which impedes them from working to

an extent that would support a finding that the Debtors face an irremediable financial condition likely

to persist for a significant portion of the loan repayment period.  Finally, although the third *Brunner*

factor presents perhaps a bit closer call for summary judgment purposes, for all of the reasons stated

above, the Court also concludes that the Defendant has demonstrated an entitlement to summary judgment with respect to it as well.

The *Amended Motion for Summary Judgement* filed by the Defendant having previously been granted by the *Order* entered at Doc. No. 38, and this *Memorandum Opinion* merely being a written exposition of the Court's finding of fact and conclusions of law in that regard for purposes of the appeal which the Debtors have taken, no further Order follows

Dated: March 9, 2012

Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case administrator to serve:
    Megan E. Farrell, Esq.
    Lloyd E. Wilson, II, Esq.
    Pamela Goforth, Debtor
    Steven Goforth, Debtor